# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA,    )
       )
   Plaintiff,   )
       )
   v.       )   No. 03 C 9360
       )
OSYP FIRISHCHAK,   )
a.k.a OSIP/YOSEF/JOSIF/JOSYF,   )
   FIRISCHTSCHAK/FIRISCAK/   )
   FIRISCHAK/FIRISZCZAK/   )
   FIRISCHTSCHUK/   )
   FIRITSCHAK/FIRSCHAK   )
       )
   Defendant.   )

**FILED**

AUG 3 0 2005

Judge Samuel Der-Yeghiayan
U.S. District Court

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

The government brought this civil action against Defendant Osyp Firishchak ("Firishchak") by filing a four count complaint alleging that Firishchak's United States citizenship was illegally procured, and therefore must be revoked pursuant 8 U.S.C. § 1451(a). A bench trial was held before this court on August 1, 2, and 3 of 2005.

Firishchak has unsuccessfully attempted to deceive the government and this Court. Firishchak's shameless attempt to excuse himself from an inexcusable act is cowardly. We have taken all of the evidence presented at trial into consideration and have reviewed all of the documents submitted to the court by the parties. We

1

find that Firishchak lied on the stand before the court and we find that he was a member of the Ukranian Auxiliary Police ("UAP") during World War II.

United States citizenship through naturalization is an honor and a privilege. It would be a travesty of justice to grant citizenship to an individual such as Firishchak or to allow him to keep his citizenship which was procured illegally through fraud and deceit. The evidence presented by the government and Firishchak's own incredible testimony shows that he was a participant in an organization that perpetrated some of the most horrific acts against human decency ever known in history. Since the government has shown by clear and convincing evidence that Firishchak was a member of the UAP, the court cannot turn a blind eye to his reprehensible conduct due to the passage of time or his advanced age. Firishchak, after procuring his entry into the United States illegally, has enjoyed over 50 years of the benefits of a life in the United States, a life victims of the atrocities were given no chance to enjoy. Sometimes the wheels of justice grind slowly, but they grind exceedingly fine. Justice has finally caught up with Firishchak.

## FINDINGS OF FACT

1. Firishchak was born on April 18, 1919, in Trebuszany (Trebusany, Trybushany, Tyshbushany), a town which became a part of Czechoslovakia after World War I, and now is a part of Ukraine (and renamed Delovoe (Delovoye)).

2. Firishchak's father was named Hrec (Hryts) Firishchak. Firishchak's mother was named Mariya Firishchak (neé Yurkuch, Yurkuts).

3. No other persons with Firishchak's name were born in the town of Trebuszany on the same date that Firishchak was born (*i.e.*, on April 18, 1919).

4. On August 1, 1941, following Nazi Germany's June 1941 invasion of what was then Soviet territory, Nazi Germany incorporated eastern Galicia into the so-called Government General, a territory comprising the central and southern part of Nazi-occupied prewar Poland. The new Galician territory, designated "District Galicia," was ruled from the city of L'viv (L'vov, Lwow), which the Germans called Lemberg.

5. In August 1941, the German Commander of the Order Police for District Galicia directed the formation of Ukrainian auxiliary police ("UAP") forces, also commonly referred to as the "Ukrainian Police," to aid German occupation authorities in policing the district.

6. Throughout its existence, the UAP in District Galicia was financed, and operationally directed and controlled, by German authorities. The members of the UAP in L'viv were uniformed, armed, paid a salary, and were given various benefits by the German authorities, including leave, and preferential

access to scarce heating fuel, potato and other rations in winter.

7.   The Nazi occupation forces enacted a series of race-based persecutory policies against the civilian population of District Galicia. Jews were at the bottom of the Nazi racial hierarchy, and the persecution and eventual elimination of Jews was a central objective of the Nazi invasion of eastern Europe and the territories of what was then the Soviet Union, and its subsequent occupation policy.

8.   Poles and Ukrainians also were considered by the Nazis to be of low racial value, but not nearly as low as Jews. Unemployed Poles and Ukrainians, particularly young men, were at risk of being seized for local labor or transported to Germany to perform labor for the German Reich.

9.   Nazi persecutory policy toward the Jews in District Galicia had three main components: 1) all Jews first were confined in ghettos and issued new identification papers that identified them as Jews; 2) nearly all of these Jews later were forcibly removed from the ghetto for subsequent murder either by shooting or gassing; and 3) a limited number of Jews whom the Germans considered "work capable" temporarily were spared and were transferred to forced labor camps where many died from starvation, disease and other inhumane conditions.

4

10.   The UAP was divided into "commissariats." Each commissariat was responsible for a geographically defined section of the city and was tasked to enforce German rule, including day-to-day anti-Jewish policies.

11.   The 1st Commissariat of the UAP in L'viv had responsibility for the heart of the city, where most offices of the German security authorities were situated. The 1st Commissariat encompassed a portion of the Jewish residential district ("ghetto") until spring 1942. Thereafter, the northern boundary of the 1st Commissariat abutted the southern edge of the L'viv Jewish ghetto.

12.   The headquarters building of the 1st Commissariat of the UAP was located at 30 Kazymyrivska (Kasimir) Street in L'viv.

13.   Firishchak began working for the 1st Commissariat of the UAP in L'viv (Lwow, L'vov, Lemberg) on October 25, 1941. He held the rank of *Wachtmeister* (Police Private). Firishchak served in the 1st Commissariat of the UAP until at least October 1943.

14.   At some time in October 1943, Firishchak transferred from the 1st Commissariat to the Guard Company of the UAP in L'viv, and served in that unit until shortly before the German occupation forces fled L'viv in July 1944.

15. The Guard Company of the UAP was situated in the heart of what had until June 1943 been the Jewish ghetto in L'viv.

16. During his service in the UAP in L'viv, Firishchak was uniformed, armed, and paid a salary, and he received all of the benefits accorded by the German authorities to members of the UAP.

17. During his service in the UAP in L'viv, Firishchak performed all of the duties of a Ukrainian Auxiliary policeman, which included on a routine and daily basis enforcing Nazi anti-Jewish policies.

18. UAP participation was central to the implementation of all facets of Nazi anti-Jewish policy. On a routine and daily basis, the men of the UAP all contributed to the Nazi persecution of the Jews of L'viv.

19. The Ukrainian Auxiliary policemen in L'viv enforced Nazi persecutory measures against those who the Nazis deemed dangerous or undesirable because of their race, religion, national origin or political belief, especially the Jews in the city. These activities included checking personal identification documents and arresting Jews who lacked special work passes, and arresting Jews who failed to wear an armband bearing the Star of David symbol that publicly identified them as Jews. All members of the UAP performed these

duties.

20.    Even enforcement of rules applicable to the general civilian population had a disproportionate effect on the Jews of L'viv. For instance, because food rations for Jews were set at half those of non-Jews, Jews were forced to try to make up for the deficiency by purchasing more expensive goods on the black market. Policing of black market activity by the UAP thus impacted more heavily on the Jewish population.

21.    In November 1941, all Jews living in L'viv were ordered to move to a newly-created Jewish ghetto north of the city center. The area was cleared at the same time of all non-Jews. The operation was not completed until spring 1942.

22.    During this ghettoization process, German police and security personnel screened Jews moving into the quarter for personal valuables, which they seized. Security forces also selected ill, weak, or old Jews for immediate "resettlement" -- a Nazi euphemism for murder. Persons so selected were removed to a nearby forest and shot. Thousands of Jews were killed during the ghetto's creation.

23.    German security forces began the reduction of L'viv's ghetto in a series of

actions in March 1942, even as the ghetto was itself still being consolidated. Jews were first collected at a school, then were transferred to a railhead on the edge of the city, from where most were taken by train for "labor deployment in the East" -- another Nazi euphemism for murder, in this instance in the gas chambers of Belzec extermination center, outside of L'viv. A few Jews were transferred to Janowska Forced Labor Camp in L'viv, where almost all died.

24. Ukrainian Auxiliary policemen in L'viv performed so-called "extraordinary" duties with regard to the ghetto, which included, *inter alia*: taking part in sweeps of the ghetto during periodic reduction actions; manning cordon posts around the city to prevent Jews from escaping before and during such actions; and hunting for Jews who attempted to hide or flee.

25. Throughout its existence, the UAP in L'viv did not have sufficient manpower to carry out the responsibilities assigned to it by German security authorities, particularly with regard to its "extraordinary" duties, *i.e.*, those relating to periodic reductions of the Jewish ghetto. All members of the UAP -- including Firishchak -- thus performed these "extraordinary" duties.

26. Ukrainian Auxiliary policemen, including members of the 1st Commissariat, took part in the March 1942 ghetto reduction actions, and delivered to their German superiors thousands of Jews for "resettlement."

27. Another round-up of Jews took place in L'viv on June 24-25, 1942. The Jews were sent to Janowska Forced Labor Camp, or were "locally resettled," *i.e.*, shot in a forest outside of the city.

28. Ukrainian Auxiliary policemen, including members of the 1st Commissariat, participated in the round-up of Jews that took place in L'viv on June 24-25, 1942.

29. In August 1942, German authorities began the largest ghetto reduction action against the residents of the L'viv Jewish ghetto, an action commonly known as the "Great Operation." During this action, which began August 10 and continued until August 23, Ukrainian Auxiliary policemen checked the identity papers of Jews in the ghetto. Jews whose documents attested to employment in a German-sanctioned industrial enterprise were left at liberty in the ghetto; Jews who lacked the necessary authentication stamps or documentation were seized and delivered to an assembly point in the city center to await "resettlement." Ukrainian Auxiliary policemen also: escorted Jews from the assembly point to the railhead or Janowska Forced Labor Camp; provided search teams that cleared Jews from apartments; escorted the Jews between processing points; and manned the cordon duty posts to prevent Jews from escaping from the city. During the two-week operation members of the UAP seized and delivered for "resettlement" at least 18,400 Jews.

30.   Prior to the Great Operation, the UAP established a cordon around L'viv to prevent Jews from fleeing the city to escape "resettlement," as had occurred during earlier ghetto clearance actions.

31.   Members of the 1st Commissariat and its Department of Street Traffic actively participated in all aspects of the Great Operation.

32.   During the Great Operation of August 1942, Ukrainian Auxiliary policemen, including members of the 1st Commissariat, shot to death dozens of Jews who resisted, fled, or attempted to hide.

33.   On August 9, 1942, on the eve of the Great Operation, Firishchak took part in a search to locate seven men who did not report for duty with the 1st Commissariat's Department of Street Traffic. Several of the men Firishchak had been assigned to locate thereafter participated directly in the Great Operation.

34.   Between March 1942 and June 1943, virtually all of the more than 100,000 Jews in L'viv were seized and transported to killing sites, including Belzec, or to forced labor camps. The Jewish ghetto in L'viv (which became known as the "Jewish camp" (*Julag*)) was liquidated in June 1943, and its Jews were

shot or transferred to forced labor camps. Members of the 1st Commissariat participated in these June 1943 ghetto reduction operations. A small number of Jews survived by hiding in the ruins of the ghetto.

35.  Between November 19 and 23, 1943, all Ukrainian Auxiliary policemen in L'viv, including those assigned to the Guard Company, were ordered onto the city streets for a search and cordon (blockade) operation to locate Jews in hiding or who otherwise managed to evade capture during earlier actions. During this operation, which immediately followed the final mass shooting of Jewish prisoners at the Janowska Forced Labor Camp, Ukrainian Auxiliary policemen manned roadblocks and patrolled the streets to screen any person attempting to leave the city, particularly people considered to be "Jewish looking." Jews identified during this operation were escorted by UAP personnel to the commissariat building and later turned over to German authorities.

36.  Firishchak entered the Guard Company of the UAP some time in October 1943 (*see* Finding of Fact # 14, *supra*), and thus participated in the search and cordon operation between November 19 and 23, 1943.

37.  In April 1949, Firishchak sought a determination from the United States Displaced Persons Commission (DPC) that he was a Displaced Person as

defined in the Displaced Persons Act of 1948, Pub. L. No. 80-774, ch. 647, 62 Stat. 1009 (DPA), and therefore was eligible to immigrate to the United States under the DPA.

38. In connection with his application to the DPC, Firishchak described his employment and residences from 1941 to 1944, claiming he had worked as a laborer for: 1) a factory in Nitra, Slovakia, from 1939 to December 1941; 2) a Ukrainian cooperative in "Lwow" (*i.e.*, L'viv), Poland, from December 1941 to April 1944; and 3) a building firm in Nitra, Slovakia, from April to October 1944.

39. Firishchak's description of his wartime activities to the DPC was false, inasmuch as he actually served from October 1941 through July 1944 as a Ukrainian Auxiliary policeman in L'viv.

40. On or about May 10, 1949, Firishchak filed an Application for Immigration Visa and Alien Registration with the American Consulate in Munich, Germany, to obtain a non-quota immigration visa to the United States under the DPA.

41. On his visa application, Firishchak described his residences from 1941 to 1944, declaring that he had resided in Nitra, Slovakia (1939 to December

12

1941); Lemberg (*i.e.* L'viv), Poland (December 1941 to April 1944); and Nitra, Slovakia (April 1944 to October 1944).

42. In the course of applying for a non-quota immigration visa under the DPA, Firishchak orally swore to the truth of the information on his visa application.

43. Firishchak did not truthfully disclose his service in the UAP to the vice consul who processed his application, and who conducted a mandatory interview of Firishchak, during which Firishchak was specifically questioned about his activities during the war.

44. Firishchak was issued Immigration Visa No. 1959/50 under the DPA, which he used to enter the United States at the Port of Boston, Massachusetts, on or about June 2, 1949.

45. On or about September 14, 1954, Firishchak signed and filed a Petition for Naturalization with the United States Immigration and Naturalization Service. He orally swore to the truth of the information he provided therein.

46. On November 11, 1954, the United States District Court for the Northern District of Illinois granted Firishchak's Petition for Naturalization and issued

to him Certificate of Naturalization No. 7365065.

47. On June 23, 2003, Firishchak voluntarily appeared at the offices of the United States Attorney in Chicago, Illinois, for a sworn interview regarding his whereabouts and activities in Europe during World War II, his immigration to the United States, and his subsequent naturalization as a United States citizen.

48. During that voluntary sworn interview, Firishchak was shown an exhibit containing eight signatures collected from other documents. The signatures were written in Ukrainian, utilizing the Cyrillic alphabet. Firishchak identified seven of the signatures on that document as his signature.

49. The seven Ukrainian language/Cyrillic alphabet signatures identified by Firishchak during his June 23, 2003 sworn interview as his signature were taken from the following documents:

a. Application for permanent insurance identification document, L'viv, December 19, 1941, signed (in Cyrillic) Yosyf Firishchak. That document states that "Yosyf Firishchak," born April 18, 1919 in Trybushany, as of that date had been employed by the "1st Commissariat of the Ukrainian Police" since October 25, 1941. That document also states that the first name of the father of "Yosyf

Firishchak" was "Hryts," and lists the residence of "Yosyf Firishchak"
as 30 Kazymyrivs'ka Street in L'viv.

b.      Registration form, L'viv, March 26, 1942, signed (in Cyrillic) Y.
        Firishchak. That document states "Osyp Firishchak," born April
        18, 1919 in Tryshbushany, began working on October 25, 1941,
        as a *wachtmeister* (police private) in the 1st Commissariat of the
        Ukrainian Auxiliary Police in L'viv.

c.      List of names of 1st Commissariat men acknowledging being
        briefed about a regulation issued on March 4, 1942, by the
        Higher SS and Police Leader (no date), signed (in Cyrillic) "O.
        Firishchak." That document contains a list of signatures of
        members of the 1st Commissariat of the Ukrainian Police in
        Lemberg (L'viv), acknowledging that they were briefed about
        regulations concerning behavior toward Germans. Listed at
        number 15, with signature, is *Wachtmeister* "Osyp Firistschak."

d.      Roster of men briefed on the report and wanted list of the
        Government General published on April 8, 1942 (no date),
        signed (in Cyrillic) "O. Firishchak." That document contains a

list of signatures of Ukrainian policemen in Lemberg (L'viv), acknowledging that they were briefed about a report and wanted list for the Government General. Listed at number 67, with signature, is *Wachtmeister* "Osyp Firistschak."

e. Roster of men briefed on the report and wanted list of the Government General published on April 8, 1942 (no date), signed (in Cyrillic) "O. Firishchak." That document, which is nearly identical to the previous document, contains a list of signatures of Ukrainian policemen in Lemberg (L'viv), acknowledging that they were briefed about a report and wanted list for the Government General. Listed at number 67, with signature, is *Wachtmeister* "Osyp Firistschak."

f. Roster of 1st Commissariat policemen receiving heating allowances for the winter of 1943-44 (no date), signed (in Cyrillic) "Firishchak." That document contains a list of signatures of 1st Commissariat policemen acknowledging receipt of payment for heating. The ninth signature on the list is *Vistun* (Ukrainian for *Wachtmeister* (police private)) "Osyp Firistschak."

g.  Roster of 1st Commissariat policemen receiving heating allowances for the winter of 1943-44 (no date), signed (in Cyrillic) "Firishchak." That document is nearly identical to the previous one, and contains a list of signatures of 1st Commissariat policemen acknowledging receipt of payment for heating. The ninth signature on the list is *Vistun* "Osyp Firistschak."

50.  The Ukrainian language/Cyrillic alphabet signatures on these documents are spelled the same. All of these documents refer to Firishchak.

51.  Eight additional wartime documents of the UAP identify "Osyp Firishchak" or "Firischtschak O." as a Ukrainian Auxiliary policeman, utilizing the phonetic Latin alphabet spelling of his Ukrainian name. Several of those specifically identify him as a member of the 1st Commissariat, and one notes his date of birth as April 18, 1919. All of these documents refer to Firishchak.

52.  Six additional wartime documents of the UAP identify "Osyp Firiszczak" as a member of the Guard Company of the UAP. All of these documents refer to Firishchak, utilizing a standard (Polish) transliteration of his Ukrainian name.

53.  Firishchak's Ukrainian surname on GX 33-39, 40-47, 51, 139, 140,

141a, 141j, 142a, and 142 translates phonetically from the Cyrillic alphabet into the Latin alphabet as "Firishchak," "Firishchtschak," "Firistschak, " or "Firiszczak." Any variation in the transliterated (*i.e.*, Latin alphabet) spelling of Firishchak's Ukrainian surname on these documents is insignificant. During his voluntary sworn interview Firishchak clearly identified the Ukrainian language/Cyrillic alphabet signatures on GX 33-39 as his own. During his trial testimony he incredibly claimed that at the sworn interview he did not understand what was clearly asked of him in the following exchange:

Q. [C]an you tell me if these look like your signatures on this sheet [GX 146 (Ex. 50; GX 148].

A. Yeah, that's mine.

Q. These are yours?

A. Yeah, this one, this one, but this one, could be I was in better shape.

Q. When you say 'this one' and this one,' lets start with [signature] No. 1. I mean, do these look like your signatures, [numbers] 1, 2, 3?

A. Yeah.

Q. 4?

A. Yeah.

Q. 5?

A. Yeah.

Q. 6? 7?

A. Except this one, yes.

Q. 8 is the only one you have a question about?

A. Yeah.

Q. But the rest of them look fine?

A. Yeah.

(GX 146 at 13-14). At no time during trial did he deny that the seven signatures he identified during that interview in fact were his. In light of the certainty with which he identified the signatures as his own, any recantation at trial would not have been credible. Additionally, GX 33 and 34 also bear Firishchak's admitted date and place of birth; GX 33 also correctly lists the first name of Firishchak's father ("Hyrts"). GX 43 also correctly notes Firishchak's admitted date of birth. Further, Firishchak admitted at trial that he lived in L'viv during all or most of the period that a person bearing his name, date and place of birth, with a father named "Hyrts," served as a Ukrainian Auxiliary policeman. The absence of any evidence that another person bearing Firishchak's name, with the same date of birth, from the same village, whose father was named "Hyrts," served in the UAP between October 1941 and July 1944, also confirms that all of the documents refer to the same individual -- Firishchak.

## WITNESS TESTIMONY

The Government presented testimony from two qualified expert witnesses (one during trial and one via *de benne esse* deposition), and from three fact witnesses

(two during trial and one via *de benne esse* deposition). All of the Government's witnesses testified credibly.

Dr. Dieter Pohl, a scholar at the Institute for Contemporary History in Munich, Germany, testified credibly at trial as an expert witness for the Government on the Nazi occupation of District Galicia, including the Ukrainian Auxiliary Police in L'viv, and about documents relating to those subjects. Firishchak did not dispute Dr. Pohl's credentials as an expert; in any event he is amply qualified to provide expert testimony. Dr. Pohl has devoted his entire professional career to the historical examination and analysis of German and East European history since 1918, especially the Nazi era from 1933 to 1945. Relying on properly authenticated wartime documentation, Dr. Pohl detailed the origin, formation, function and operation of the UAP during the Nazi occupation of L'viv, the nature of the persecution inflicted by the Nazis -- with the routine and daily assistance of the UAP -- upon certain civilians deemed to be enemies of Germany because of their race, religion, national origin, or political opinion, particularly the Jewish population of the city. He also explained the role played by Firishchak, as a Ukrainian Auxiliary policeman, in carrying out that persecution.

Robert Groner, a former trial attorney with the United States Department of Justice Office of Special Investigations, testified credibly at trial as a witness for the Government. He explained that in advance of Firishchak's voluntary sworn interview in June 2003, he prepared a document (GX 146, Ex. 5; GX 148) containing eight samples of Firishchak's Ukrainian language/Cyrillic alphabet

signature. Mr. Groner testified that he selected seven of these signature from wartime documents which showed that Firishchak served in the UAP, cut those signatures from photocopies of the wartime documents, and pasted them onto GX 148. (*See* Agreed Fact #27). Mr. Groner was present at the voluntary sworn interview of Firishchak on June 23, 2003, and testified that during that interview the document containing the signature samples was shown to Firishchak, who identified as his own the seven signatures taken from wartime documents showing that Firishchak served in the UAP. (GX 146 at 13-14). Mr. Groner noted that Firishchak declined the services of an interpreter (who was present), and was composed, lucid and responsive during the interview -- except when he was shown documents regarding his service in the UAP, when he became nervous and agitated.

William Weiss, a survivor of the L'viv Jewish ghetto, testified credibly at trial as a witness for the Government. He discussed his experiences during his forced confinement to the ghetto, and related the horrible mistreatment he and his family suffered at the hands of the Nazi occupation forces, with the routine and daily participation of the Ukrainian Auxiliary Police.

Mario DeCapua testified credibly via *de benne esse* deposition as an expert witness for the Government regarding the operation of the United States Displaced Persons Commission ("DPC"), an agency charged with implementing the DPA. Firishchak did not dispute Mr. DeCapua's credentials as an expert; in any event he is uniquely qualified to provide expert testimony. Mr. DeCapua served from 1948 until 1952 as the head of the Security Investigations Division of the DPC. Mr.

DeCapua testified that he helped prepare the "Inimical List," a listing of organizations whose members automatically were ineligible for admission under the DPA. He explained that the list was not exclusive, and that membership in organizations not named on the list also could be disqualifying under the DPA. (GX 153 at 18, 24-25). Mr. DeCapua also described the screening procedures (which he developed) that a DPC case analyst was required to follow when processing visa applications under the DPA. He testified that investigations were conducted for the DPC by the U.S. Army Counterintelligence Corps ("CIC"), which paid particular attention to the activities of young men of military service age who lived in areas occupied by German forces during the war. Any information regarding an applicant's wartime activities would be noted in a report to the DPC. (GX 153 at 29-32). Mr. DeCapua stated that under DPC procedures an analyst would have rejected -- and in fact did reject -- visa applications of persons known to have served in a police force created and directed by Nazi German authorities, such as the UAP. (GX 153 at 17-22; 26-33, 36-39, 43-45, 47, 52, 69; GX 153, Ex. 2).

Everett Coe, a former U.S. Department of State Vice Consul who processed Firishchak's application for an immigrant visa in Munich, Germany, in 1949 (GX 154 at 37), testified credibly via *de benne esse* deposition as a witness for the Government. Mr. Coe testified that he worked exclusively on visa applications under the DPA. (GX 154 at 17-18). He explained the procedures that he followed as a vice consul when processing those applications. He stated that in determining an applicant's eligibility, he relied on reports prepared by the DPC regarding that

applicant's background. (GX 154 at 21, 41-42, 44-45). He testified that it was mandatory for a visa applicant to submit to an interview by a vice consul, and that such interviews were conducted under oath, with the assistance of a translator if needed. (GX 154 at 22-23). He also testified that it was standard procedure -- and his personal practice -- to separately ask an applicant about his or her wartime activities and whereabouts. (GX 154 at 24, 32, 38-39). That was particularly important when the applicant was a man who lived during World War II in areas under Nazi occupation and was of age for Nazi service. (GX 154 at 39). Mr. Coe stated that he would not have approved Firishchak's visa application had Firishchak truthfully disclosed his wartime service in the UAP. (GX 154 at 31-35, 42-45). Mr. Coe testified credibly that Firishchak was granted a visa because he misrepresented his service in the UAP to the DPC and to Coe during his mandatary interview. (GX 154 at 44-45).

Firishchak testified in his own defense at trial, and denied ever having served in the UAP in L'viv. Firishchak's testimony was not credible. Firishchak's demeanor and mannerisms clearly showed that he was lying under oath on the stand. His testimony was also replete with inconsistencies and he provided the court with a completely unbelievable story regarding his life during World War II. It is hardly a surprise that Firishchak would attempt to distance himself in a coy and self-serving manner from the atrocities of the Nazi regime and from his lies that allowed him to obtain entry into the United States and eventual United States citizenship, but the evidence points undeniably at his deception.

Firishchak acknowledged during his interview by the government that seven of the eight signatures that he was shown were his signatures and he was only unsure as to the eighth signature. During his testimony at trial, Firishchak's main contention as to his identification of the signatures during the interview was that he was not first told that the signatures were taken from papers that would incriminate him. Firishchak thus has admitted that he gave the government a truthful answer about the signatures, but only regrets not being forewarned about the incriminating papers so that he would have had a chance to be untruthful. We are concerned with Firishchak's truthful statements rather than the lies that he would have told if forewarned that the government had the goods on him.

Firishchak acknowledged on the stand that the individual identified on the incriminating documents presented by the government had the same name as him, the same birth date, the same name of a father, was from the same village as him, and was located in the same town as he was at the time in question during World War II. Firishchak pointed out that some of the names on the documents were not spelled same as his name, but the government's expert witness, Dr. Pohl, adequately explained how there could be different spellings depending on the language that was used on the documents. Firishchak provided the court with a fairy tale depicting himself as a homeless soul, drifting though Nazi occupied territories, from place to place, and hiding out in coffee shops along the way. Just as it pushes the realm of credibility that Firishchak sat out the war in coffee shops, Firishchak's attempts to hide behind semantics as to the spelling of his name is preposterous.

Firishchak testified that he left his factory job in Nazi Germany and went with little money and without proper travel documents, in company of men he did not know. Firishchak claimed that he was on the way to a town to go to school with two individuals. However, strangely Firishchak admits that he did not even know the name of the town that he was going to go to school. Firishchak claims that he was able to move at will without travel documents and without being challenged by anyone. Firishchak acknowledges that he ended up in L'viv. Interestingly, the individual also named Firishchak who is identified on the documents presented by the government as a Ukrainian Auxiliary policeman also resided in L'viv.

Firishchak's story of his time in L'viv, sitting in coffee shops, and picking up occasional odd jobs without detection by the Nazis or the UAP is totally unbelievable. Such a tale is directly contrary to all of the reliable and credible testimony provided by the government that showed that the UAP regularly checked the identification of persons on the street and regularly sought out individuals to do work for the Nazi regime. It is a ridiculous notion that Firishchak, an able bodied young man would be able to spend the duration of World War II hanging out, unnoticed in coffee shops. During the trial, Firishchak painted an abstract and general story of his activities in L'viv in order to avoid showing his hand of deception. However, the government repeatedly was able to get Firishchak to trip over his own lies on the stand. For instance, Firishchak claimed that he never slept in the same place and was always on the move, but then he acknowledged that he had an address in L'viv for an extended period of time. In Firishchak's answer to

25

interrogatories in this action he admitted that he spent most of the duration of the war living at two fixed addresses in L'viv, and provided the street names and the names of his landladies. Firishchak also attempted to change the facts during his testimony saying that he was wandering in the country from time to time and sleeping in barns rather than residing in L'viv. Firishchak's testimony, in short, was entirety unbelievable and he only sunk himself further by his mannerisms on the stand which betrayed the fact that he was lying under oath to save himself from denaturalization.

## CONCLUSIONS OF LAW

Key questions before us are whether Firishchak is a member of the UAP, whether as a member of UAP he is accountable for the atrocities of the UAP, whether he procured his entry into the United States illegally, and whether the government has proved its case by clear, unequivocal, and convincing evidence. *Kungys v. United States*, 485 U.S. 759, 772 (1988); *Fedorenko v. United States*, 449 U.S. 490, 505 (1981). The following are the court's conclusions of law:

1. The following historical documents offered by the Government regarding the Nazi occupation of District Galicia and the city of L'viv, the establishment, operation, and wartime activities of the UAP, and Firishchak's service in the UAP, were properly admitted into evidence pursuant to Federal Rules of

Evidence 803(16) and 901(b)(8) (admission of ancient documents):  GX 1, 3-8, 10, 12-16, 18-19, 21-23, 25-26, 33-41, 43-47, 51, 54, 57-58, 60-61, 68-76, 80-82, 87-91, 93-107, 109-110, 112, 114-119, 120-123, 125-126, 128-131, 133140, 141a, 141j, 142a, 142b, 160.  These documents all were shown to be: 1) in such condition as to create no suspicion concerning their authenticity; 2) found in places where, if authentic, they would likely be; and 3) in existence 20 years or more at the time they were offered. Fed. R. Evid. 901(b)(8). *See United States v. Kairys*, 782 F.2d 1374, 1379 (7th Cir. 1986).  It is not necessary to show a chain of custody for an ancient document.  *Id.* at 1379; *see also United States v. Koziy*, 728 F.2d 1314, 1322 (11th Cir. 1984).

Firishchak argued that the government's case is not strong because the case is built mainly upon documents rather than eyewitnesses' testimony, but it is an undeniable fact that many eyewitness did not survive the atrocities perpetrated by the UAP and those that did survive may not remember the names and faces of the perpetrators clearly after over fifty years have passed. The question therefore becomes: should the mere passage of time shield perpetrators from being held accountable for such atrocities?  The answer is a resounding NO.

2.    The historical documents identified in Conclusion of Law # 1, *supra*, independently were properly admitted into evidence as self-authenticating documents pursuant to Fed. R. Civ. P. 44(a)(2) and Fed. R. Evid. 902(3)

(addressing foreign public documents), or Fed. R. Civ. P. 44(a)(1) and Fed. R. Evid. 902(4) (addressing admission of certified copies): GX 1, 3-8, 10, 12, 13, 15-16, 18, 25-26, 33-41, 43, 46-47, 51, 60, 61, 68-75, 81-82, 87, 89-91, 93-94, 96, 101, 103-07, 109, 112, 114, 117,-19, 121, 123, 125-26, 128-29, 134-37, 139-40, 141a, 141j, 142a, 142b. These documents all contained the required archival certifications (from collections such as the State Archive for the L'viv Oblast (Ukraine), the U.S. National Archive and Records administration, and the U.S. Holocaust Memorial Museum); documents from non-U.S. archival sources were accompanied by the necessary certifications by U.S. officials in those countries. *Koziy*, 728 F.2d at 1321-22.

3. The remaining exhibits offered by the Government (GX 146 (with attachments), 147 (with attachments), 148, 152, 153 (with attachments), 154 (with attachments), and 161) were admitted without objection.

4. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1345, and by INA Section 340(a), 8 U.S.C. § 1451(a). (Dkt. #5, Firishchak's Answer #4).

5. Firishchak is a resident of Chicago, Illinois, and thus venue is proper in this District under INA Section 340(a), 8 U.S.C. § 1451(a). (Dkt. #5, Firishchak's Answer #3, 5).

6.  8 U.S.C. § 1451(a) provides for the revocation of Firishchak's citizenship and the cancellation of his Certificate of Naturalization if his citizenship was illegally procured. (Agreed Legal Finding #1). *See e.g. Fedorenko*, 449 U.S. at 514-15.

7.  8 U.S.C. § 1427 sets forth the requirements for the legal procurement of citizenship through naturalization. Section 1427(a)(1), provides that no person shall be naturalized unless such person has been lawfully admitted to the United States for permanent residence. (Agreed Legal Finding #2). *See e.g. Fedorenko*, 449 U.S. at 506, 508, 515; *United States v. Tittjung*, 235 F.3d 330, 336-37 (7th Cir. 2000).

8.  To be lawfully admitted to the United States for permanent residence, an individual must be in possession of a valid visa and be legally eligible for that visa. INA Section 211(a), 8 U.S.C. § 1181(a). (Agreed Legal Finding #3). *Fedorenko*, 449 U.S. at 506, 508, 515; *Tittjung*, 235 F.3d at 336-37.

9.  The lawfulness of Firishchak's admission is determined according to the law in effect at the time of his or her initial entry into the United States. (*See* Agreed Legal Finding #4). *See Fedorenko*, 449 U.S. at 507, 514; *Tittjung*, 235 F.3d at 336-37. Because Firishchak entered the United States by means

of a visa issued under the DPA, the lawfulness of his entry must be examined under that Act. *Fedorenko*, 449 U.S. at 507, 514; *Tittjung*, 235 F.3d at 336-37.

10. Firishchak's visa eligibility also was subject to State Department regulations in effect at the time he applied for his visa. (*See* Agreed Legal Finding #15). *See* 22 C.F.R. §§ 53.32, 53.33 (1949) (GX 154 (Ex. 5)). *See also* Ex. 154, Coe Testimony.

11. Under DPA Section 10, the burden was at all times on an applicant to establish his or her eligibility as a displaced person. (DPA Section 10, 63 Stat. 1013). *See United States v. Mandycz*, 359 F. Supp.2d 601, 618 (E.D. Mich. 2005). *See also* Ex. 153, DeCapua Testimony.

12. The Government's burden in this denaturalization action is to prove its case by "clear, unequivocal and convincing evidence," which must not leave "the issue in doubt." *Fedorenko*, 449 U.S. at 505-06. *United States v. Hajda*, 135 F.3d 439, 444 (7th Cir. 1998).

13. To meet its burden of proving that Firishchak was not lawfully admitted to the United States as a result of his activities during World War II, the Government need not present admissions by Firishchak or testimony from live

witnesses who confirm Firishchak's Nazi service. *See, e.g., Hammer v. INS,* 195 F.3d 836, 843 (6th Cir. 1999) (finding assistance in persecution under the Holtzman Amendment, 8 U.S.C. § 1182(a)(3)(E), in the absence of admissions or fact witness testimony); *United States v. Szehinskyj,* 104 F. Supp. 2d 480, 494-95 (E.D. Pa. 2000) (finding that the defendant assisted in persecution despite lack of "live evidence"); *United States v. Tittjung,* 753 F. Supp. 251, 256 (E.D. Wis. 1990)(finding assistance in persecution based on Nazi wartime documents).

14. The DPA, in designating who was a "displaced person" eligible for immigration, incorporated by reference the definition contained in Annex I to the Constitution of the International Refugee Organization (IRO). DPA Section 2(b), 62 Stat. 1009, 1013 (1948). (Agreed Legal Finding #5). That definition excluded from displaced persons status -- and thereby barred from entry into the United States -- any person who had "assisted the enemy in persecuting civil populations . . . ." Annex I, Part II, Section 2(a), *reprinted in* 62 Stat. 3037 at 3051-52 (1948). (Agreed Legal Finding #5). *Fedorenko,* 449 U.S. at 495-96 n.3 n.4, 510-11; *United States v. Schmidt,* 923 F.2d 1253, 1256 (7th Cir. 1991).

15. An individual need not be shown to have committed a particular atrocity, or a specific persecutory act, to be excludable for assisting in persecution under

DPA Section 2(b). (*See* Agreed Legal Finding #6). *Fedorenko*, 449 U.S. at 510 n.32; *United States v. Ciurinskas*, 148 F.3d 729, 734 (7th Cir. 1998). Nor is it necessary for the Government to show that an individual served voluntarily. *Fedorenko*, 49 U.S. at 512; *Schmidt*, 923 F.2d at 1257-58.

16.  Under the DPA, visa disqualification based on assistance in persecution does not require a finding that Firishchak made a material misrepresentation in order to procure his visa. *Tittjung*, 235 F.3d at 340-41. The assistance in persecution bar "does not contain a fraud element, but rather provides wholly independent grounds for denaturalization." *Id.*; *See also United States v. Dailide*, 316 F.3d 611, 620 (6th Cir. 2003) (stating that "a finding of misrepresentation is not a necessary prerequisite to a finding of 'illegal procurement'" of citizenship).

17.  Someone who, as a member of the Ukrainian Auxiliary Police in L'viv during World War II, performed the routine and daily duties of a Ukrainian Auxiliary policeman, which included enforcing Nazi persecutory measures against Jews and others who the Nazis deemed dangerous or undesirable because of their race, religion, national origin or political belief, has assisted in the persecution of civil populations. (*See* Agreed Legal Finding #7). *United States v. Osidach*, 513 F. Supp. 51, 60-61, 63, 84-85, 97-99 (E.D. Pa. 1981)(Ukrainian policeman in Nazi-occupied Rawa Ruska, Ukraine, who patrolled the streets

of the town "to keep 'order,'" assisted in persecution; "The mere presence of the watchful eye of the conqueror or his deputies, coupled with the often demonstrated presence of both the means and the inclination to persistently inflict various indignities, physical abuse, injuries or even death, without notice or reason, is the personification of mental persecution, to anyone, let alone innocent civilian men, women, and children reduced to various degrees of substandard mental and physical well-being"). *See United States v. Koziy*, 728 F.2d 1314, 1316 (11th Cir.) (Ukrainian policeman who guarded a Jewish ghetto and participated in killings assisted in persecution), *cert. denied*, 469 U.S. 835 (1984); *United States v. Dercacz*, 530 F. Supp. 1348 (E.D.N.Y. 1982) (member of Ukrainian police force who brought Jews to the police station and reported them to the commandant and the Gestapo for not wearing their identifying armbands, and who reported civilians who sold food to the Jews in the ghetto, assisted in persecution under DPA Section 2(b)); *United States v. Theodorovich*, 102 F.R.D. 587, 591 (D.D.C. 1984) (default judgment takes as established that Ukrainian policeman in L'viv participated in persecution of Jews). *See also United States v. Stelmokas*, 100 F.3d 302, 307, 312 (3d Cir. 1996) (guard commander at Kaunas ghetto "participated in confining the Jews to an area in which they were regularly subjected to extreme deprivation, brutality, and arbitrary shootings"), *cert. denied*, 520 U.S. 1242 (1997);; *United States v. Dailide*, 953 F. Supp. 192, 194-95, 197 (N.D. Ohio 1997) (Lithuanian policeman who arrested Jews for attempting to

escape the ghetto and turned them over to the Germans assisted in persecution under DPA Section 2(b)).

18. The Court has found as a fact that during World War II Firishchak was a member of the Ukrainian Auxiliary Police in L'viv, and performed the routine duties of a Ukrainian Auxiliary policeman, which included enforcing Nazi persecutory measures against Jews and others who the Nazis deemed dangerous or undesirable because of their race, religion, national origin or political belief. (*See* Finding of Fact # 13-19, 24-36, 47-52, *supra*). Firishchak therefore assisted in persecution, and was not legally eligible to receive a visa under DPA Section 2(b). (*See* Agreed Legal Finding #7). Accordingly, the Government has proven the allegation in Count I of the Complaint, and is entitled to judgment on that Count.

19. The Court also has found as a fact that during World War II all members of the UAP in L'viv performed so-called "extraordinary" duties with regard to the Jewish ghetto, which included, *inter alia*: taking part in sweeps of the ghetto during periodic reduction actions; manning cordon posts around the city to prevent Jews from escaping before and during such actions; and hunting for Jews who attempted to hide or flee. (*See* Finding of Fact # 24-25, *supra*). Firishchak's performance of these "extraordinary" duties provides additional grounds for concluding that he assisted in persecution, and thus was

not legally eligible to receive a visa under DPA Section 2(b), as alleged in Count I of the Complaint.

20. The Court also has found as a fact that on August 9, 1942, the eve of the ghetto clearance action known as the "Great Operation," Firishchak took part in a search to locate seven men who did not report for duty with the 1st Commissariat's Department of Street Traffic, and that several of the men Firishchak had been assigned to locate thereafter participated in the Great Operation. (*See* Finding of Fact # 33, *supra*). Firishchak's conduct in this regard provides additional grounds for concluding that he assisted in persecution, and thus was not legally eligible to receive a visa under DPA Section 2(b), as alleged in Count I of the Complaint.

21. Further, someone who served in the Ukrainian Auxiliary Police in L'viv during World War II, which enforced Nazi persecutory measures against Jews and others who the Nazis deemed dangerous or undesirable because of their race, religion, national origin or political belief, assisted in the persecution of civil populations. (*See* Agreed Legal Finding #8). *See United States v. Ciurinskas*, 148 F.3d 729, 733 (7th Cir. 1998) ("Even if Ciurinskas had not personally participated, his service in the 2nd Battalion [of the Lithuanian *Schutzmannschaft* (indigenous police force)] is sufficient to constitute assistance in persecution"); *Schmidt*, 923 F.2d at 1259 ("[E]ven if Schmidt

personally did not participate in the brutal acts committed at Sachsenhausen, the fact of his armed, uniformed service is sufficient to establish that he assisted in persecution"). *Cf. Naujalis v. INS*, 240 F.3d 642, 647 (7th Cir. 2001) (a member of the same Lithuanian *Schutzmannschaft* battalion assisted in persecution by guarding "a vital railway facility" at a time when other members of the battalion were murdering thousands of Jewish men, women and children; regardless of whether Naujalis participated in those killing actions, his "service contributed to the overall strength and dynamic" of the unit).

22. The Court has found as a fact that Firishchak served during World War II in the Ukrainian Auxiliary Police in L'viv, which enforced Nazi persecutory measures against Jews and others who the Nazis deemed dangerous or undesirable because of their race, religion, national origin or political belief. (*See* Finding of Fact # 13-19, 24-36, *supra*). This finding provides additional grounds for concluding that Firishchak assisted in persecution, and therefore was not legally eligible to receive a visa under the DPA. (*See* Agreed Legal Finding #8). Accordingly, the Government has proven the allegations in Count I of the Complaint, and is entitled to judgment on that Count.

23. DPA Section 13 prohibited issuance of a visa to "any person who is or has been a member of, or participated in, any movement which is or has been

hostile to the United States or the form of government of the United States."

(Agreed Legal Finding #9). *See United States v. Wittje*, 333 F. Supp.2d 737,

747-48 (N.D. Ill. 2004), *app. pending*, No. 04-3517 (7th Cir.); *Ciurinskas*, 976

F. Supp. at 1187; *Hajda*, 963 F. Supp. at 1466, 1471. *See also United States*

*v. Koziy*, 540 F. Supp. 25, 34 (S.D. Fla. 1982), *aff'd*, 728 F.2d 1314 (11th

Cir.), *cert. denied*, 469 U.S. 835 (1984); *United States v. Osidach*, 513

F. Supp. 51, 72-75, 78-79 (E.D. Pa.), *app. dism. on Firishchak's death*, No.

81-1956 (3d Cir. July 22, 1981).

24.    The degree of participation or involvement in the hostile movement is

irrelevant; DPA Section 13 does not consider the role an individual played in

the hostile movement. *United States v. Koreh*, 59 F.3d 431, 444-45 (3d

Cir.1995), *citing Osidach*, 513 F. Supp. at 72. Rather, membership or

participation in a hostile movement *per se* precludes visa eligibility. The

"plain language of [DPA] section 13 contains no requirement that a Firishchak

personally participate in any hostile acts committed by the movement, and the

legislative history suggests that Congress sought to exclude all members of

such groups, regardless of the degree of their participation." *Koreh*, 59 F.3d

at 444-45. *See Ciurinskas*, 148 F.3d at 734 (membership in Lithuanian

*Schutzmannschaft* was sufficient for disqualification under the hostile

movement bar, even if there was no showing of active participation); *Wittje*,

333 F. Supp.2d at 748 (not necessary under DPA Section 13 to show that

member of Waffen SS guarded concentration camp). *See also Demjanjuk*,
No. 99CV1193, 2002 WL 544622, *28 (membership in units that guarded
Nazi concentration and forced labor camps rendered Demjanjuk inadmissible
under DPA Section 13).

25. Under the DPA, visa disqualification based on membership or participation in
a hostile movement does not require a finding that Firishchak made a material
misrepresentation in order to procure his visa. *See United States v. Negele*,
222 F.3d 443, 448 (8th Cir. 2000) (because the Court affirmed the
denaturalization order based on a violation of DPA Section 13, it did not need
to consider the misrepresentation charge), *cert. denied*, 531 U.S. 1153 (2001);
*Wittje*, 333 F. Supp.2d at 748 (denaturalization granted on summary judgment
based on membership in a hostile movement without a finding of a material
misrepresentation during visa application process).

26. While at the time the DPA was in effect there existed for use by immigration
officials a list of organizations considered hostile movements under DPA
Section 13, commonly known as the "Inimical List," *see Ciurinskas*, 976
F.Supp. at 1182; *Koziy*, 540 F. Supp. at, 33-34, that list was not exhaustive,
and membership or participation in organizations not appearing on the list also
was disqualifying. *See United States v. Kowalchuk*, 773 F.2d 488, 496 (3rd
Cir.1985); *Mandycz*, 359 F. Supp.2d at 619; *United States v. Kwoczak*, No.

97-5632, 2002 WL 32137688 (E.D. Pa. Nov. 1, 2002) (Attachment 3), at *3;

*Koreh,* 856 F. Supp. at 902.

27.     Someone who served during World War II in the Ukrainian Auxiliary Police
        was a member of, or participated in, a hostile movement. (*See* Agreed Legal
        Finding #10). *See, e.g., Koziy,* 540 F. Supp. at 34; *Osidach,* 513 F. Supp. at
        62-63, 97, 112.

28.     The Court has found as a fact that Firishchak served during World War II in
        the Ukrainian Auxiliary Police in L'viv, which enforced Nazi persecutory
        measures against Jews and others who the Nazis deemed dangerous or
        undesirable because of their race, religion, national origin or political belief.
        (*See* Finding of Fact # 13-19, 24-36, 47-52, *supra*). Firishchak therefore was
        a member of, or participated in, a prohibited hostile movement, and was not
        eligible under DPA Section 13 to receive a visa. (*See* Agreed Legal Finding
        #10). Accordingly, the Government has proven the allegations in Count II of
        the Complaint, and is entitled to judgment on that Count.

29.     DPA Section 10 rendered inadmissible to the United States any alien "who
        shall willfully make a misrepresentation for the purpose of gaining admission
        to the United States as an eligible displaced person" under the DPA. 62 Stat.
        1013. (Agreed Legal Finding #11).

30. A misrepresentation must be "material" for it to be disqualifying under DPA Section 10. (Agreed Legal Finding #12). *Fedorenko*, 449 U.S. at 507; *Ciurinskas*, 976 F. Supp. at 1188. A misrepresentation is "material" if it would have a natural tendency to influence the relevant decision-maker's decision. (Agreed Legal Finding #12). *Kungys v. United States*, 485 U.S. 759, 770-71 (1988). The Government is not required under this standard to prove that Firishchak would not have received a visa had he not made the misrepresentation. (Agreed Legal Finding #12). *Id.* at 771-72. *See United States v. Demjanjuk*, 367 F.3d 623, 636-37 (6th Cir.), *cert. denied*, 125 S.Ct. 429 (2004). The materiality of a misrepresentation in a denaturalization proceeding is a question of law. (Agreed Legal Finding #12).

31. Firishchak's wartime activities, in particular his membership in the UAP, and his activities as a Ukrainian Auxiliary policeman, were material facts capable of affecting the decision of the Displaced Persons Commission ("DPC") as to whether Firishchak was an eligible "displaced person" within the meaning of the DPA. Firishchak's membership in the UAP, and his activities while serving in that unit, also were material facts capable of affecting the decision of the vice consul who reviewed Firishchak's Application for Immigration Visa in order to determine whether he was eligible under the DPA for an immigrant visa. (*See* Agreed Legal Finding #13). *See Kowalchuk*, 773 F.2d at 497 (immigration officials paid "[c]lose attention . . . to the applicant's

occupation and residence during the war years and the applicant had the burden under the law of proving eligibility for a visa. Persons who had served in the Ukrainian police or militia would have been ineligible."); *Koziy*, 728 F.2d at 1319-20 ("if [Koziy] had disclosed his connection with the police force in his visa application, his application would have been rejected outright, or at the least, an investigation would have commenced"); *Dercacz*, 530 F. Supp. at 1353 (claim by Ukrainian policeman on his visa application that he had been a "dairy farmer" was a material misrepresentation under DPA Section 10); *Osidach*, 513 F. Supp. at 101-02 (claim by Ukrainian policeman that he had been a "dairy technic" was a material misrepresentation under DPA Section 10).

32. The Court has found as a fact that Firishchak served during World War II in the Ukrainian Auxiliary Police in L'viv. (*See* Finding of Fact # 13-19, 47-52, *supra*). The Court also has found as a fact that Firishchak misrepresented his service in the Ukrainian Auxiliary Police to the DPC and to the vice consul who processed his visa application. (*See* Finding of Fact # 37-43, 54, *supra*). He therefore made a willful and material misrepresentation of his wartime activities for the purpose of gaining admission to the United States as an eligible displaced person" under the DPA, and was ineligible under DPA Section 10 to receive a visa. (*See* Agreed Legal Finding #14). Accordingly, the Government has proven the allegations in Count III of the Complaint, and

is entitled to judgment on that Count.

33. At the time Firishchak entered the United States, regulations promulgated by the Department of State (pursuant to authority delegated by Presidential proclamation) forbade the issuance of a visa to any alien whose entry would be prejudicial to the United States. 22 C.F.R. §§ 53.32, 53.33 (1949). (Agreed Legal Finding #15). Among those aliens whose entry was deemed prejudicial to the United States were any person who "advocated or acquiesced in activities or conduct contrary to civilization and human decency on behalf of the Axis countries during . . . [World War II]." 22 C.F.R. § 53.33(j) (1949). (Agreed Legal Finding #15). *See Ciurinskas*, 976 F. Supp. at 1187-88; *Baumann*, 764 F. Supp. at 1337; *United States v. Stelmokas*, No. 92-3440, 1995 WL 464264 (E.D. Pa. 1995), at *24-25, *aff'd on other grounds*, 100 F.3d 302 (3d Cir. 1996).

34. "Acquiesce," as used in these regulations, includes "passive assent or agreement without protest." *United States v. Negele*, No. 4:97CV01810 (E.D. Mo. July 20, 1999), slip op. at 88 (quoting American Heritage College Dictionary 12 (1993)), *aff'd on other grounds*, 222 F.3d 443 (8th Cir. 2000), *cert. denied*, 531 U.S. 1153 (2001). *See Ciurinskas*, 976 F. Supp. at 1187-88 (Ciurinskas acquiesced in activities or conduct contrary to civilization and human decency within the meaning of the State Department regulations

because he was "aware of, and assisted in . . . activities directed against Jews"; participation in that conduct, "whether active or passive," rendered him inadmissible under 22 C.F.R. § 53.33(j)).

35. Someone who served in the Ukrainian Auxiliary Police, which was subordinate to the Nazi security authorities and routinely assisted in implementing a range of Nazi anti-Jewish policies, advocated or acquiesced in activities or conduct contrary to civilization and human decency. (*See* Agreed Legal Finding #16).

36. The Court has found as a fact that Firishchak served during World War II in the Ukrainian Auxiliary Police in L'viv, which enforced Nazi persecutory measures against Jews and others who the Nazis deemed dangerous or undesirable because of their race, religion, national origin or political belief. (*See* Finding of Fact # 13-19, 24-36, 47-52, *supra*). Firishchak therefore advocated or acquiesced in activities or conduct contrary to civilization and human decency, and thus was ineligible to receive a visa under State Department regulations. (*See* Agreed Legal Finding #16). Accordingly, the Government has proven the allegations in Count IV of the Complaint, and is entitled to judgment on that Count.

37. During closing arguments, defense argued that the government had omitted

from its pretrial pleadings three decisions which allegedly support Firishchak's claim that he is not subject to denaturalization. All three decisions are wholly inapposite to the issues before this court, and do not save Firishchak from denaturalization as a result of his service as a Ukrainian Auxiliary policeman. The court will address the three decisions below:

a.     The district court decision in *United States v. Lindert*, 907 F. Supp. 1114 (N.D. Ohio 1995), was not based on the DPA -- in fact, Lindert originally was *refused* admission to the United States under the DPA -- and in any event the court's ruling no longer is good law.

Lindert served as a guard at several concentration camps, and after the war was held by British forces as a prisoner-of-war ("POW"). His POW record mistakenly reported that he served in an SS combat unit. *Lindert*, 907 F. Supp at 1120. After he was released, Lindert applied for immigration to the United States under the DPA. His application stated only that he had served in the Waffen SS; Lindert did not reveal that he had guarded concentration camps. He was denied a visa under the hostile movement clause of DPA Section 13 based on his membership in the Waffen SS. There was no determination as to whether Lindert assisted in persecution, because he concealed his concentration camp guard service. *Id.* at 1121. In 1954, Lindert reapplied for a visa under a different statute, which did not bar entry

based on mere membership in the Waffen SS. On his visa application,
Lindert again falsely stated that he was assigned to an SS combat unit,
and did not disclose that he had served as a concentration camp guard.
*Id.* at 1121-22. Because membership in the Waffen SS by itself no
longer was considered disqualifying (as opposed to performing the
duties of a concentration camp guard) Lindert was issued a visa and
was later admitted to citizenship. *Id.*

The denaturalization complaint in that case was not brought
based on Lindert's unlawful admission to the United States. Rather, the
complaint mainly alleged that at the time Lindert applied for
citizenship, he lacked the "good moral character" required for
naturalization; the court found that the Government did not meet its
burden in that regard. *Id.* at 1123-24. That ruling has been subject to
criticism, *see* K. Lesli Ligorner, *Nazi Concentration Camp Guard
Service Equals "Good Moral Character"?: United States v. Lindert*,
12 Am. U. J. Int'l L. & Pol'y 145 (1999), and is directly contrary to the
decision in *United States v. Schiffer*, 831 F. Supp. 1166, 1172 (E.D. Pa.
1993), in which the district court denaturalized a former concentration
camp guard because he lacked the "good moral character" required for
citizenship under the INA, concluding:

> That the armed concentration camp guards played a
> major role in the persecution of . . . [prisoners] and
> in attaining the Nazi goal of annihilation is beyond

dispute.

831 F. Supp. at 1198. Schiffer "was an active participant in the persecution occurring at these camps in that he helped prevent inmates from escaping the grotesquely inhumane conditions there." *Id.*

That *Schiffer* is the better decision was made clear in December 2004, when Congress effectively overturned *Lindert* by amending 8 U.S.C. § 1101(f) to bar a finding of good moral character in cases where an alien assisted in Nazi persecution. (Attachment 4). Thus, *Lindert*, even taken on its own flawed terms, no longer is good law.

b.     The ruling in *Petkiewytsch v INS*, 945 F.2d 871 (6th Cir. 1991), a deportation (removal) case brought under the Holtzman Amendment, also does not assist Firishchak. In that case, a panel of the Sixth Circuit found that Petkiewytsch served involuntarily as "a reluctant civilian guard" at a labor education camp -- "the least punitive of all types of Nazi camps" -- and was "once himself imprisoned for failing to perform his guard duties diligently," and therefore was not deportable under the Holtzman Amendment's "assistance in persecution" clause. *Id.* at 880-81. The Seventh Circuit has thoroughly rejected the *Petkiewytsch* panel's interpretation of the Holtzman Amendment (as has every Circuit Court to consider the issue). *See Naujalis v. INS*, 240 F.3d 642, 646 (7th Cir. 2001)(*citing Kalejs v. INS*, 10 F.3d 441, 444 (7th Cir.

46

1993).

Even the Sixth Circuit, which decided *Petkiewytsch,* no longer follows that decision. In *Hammer v. INS,* 195 F.3d 836, 843 (6th Cir. 1999), the Sixth Circuit limited *Petkiewytsch* to its peculiar facts, and adopted the interpretation of the Holtzman Amendment used by the Seventh Circuit in *Kulle v. INS,* 825 F.2d 1188, 1192 (7th Cir. 1987), stating:

> The government . . . *need not present evidence of personal involvement in specific atrocities* under the Holtzman Amendment. As the Seventh Circuit has observed:
>
>> Because the statute authorizes deportation of anyone who 'assisted' in persecution, personal involvement in atrocities need not be proven. [A]n individual who served as a guard has assisted in persecution for purposes of the Holtzman Amendment . . . . Nazi concentration camps were places of persecution; individuals who, armed with guns, held the prisoners captive . . . cannot deny that they aided the Nazis in their program of racial, political and religious oppression.

195 F.3d at 843 (emphasis added), quoting *Kulle,* 825 F.2d at 1192. *See also Schellong v. INS,* 805 F.2d at 661 (individuals who held "prisoners captive [in concentration camps] . . . cannot deny that they aided the Nazis in their program of racial, political and religious oppression"). The Sixth Circuit in *Hammer* found it irrelevant that the government produced no evidence that Hammer

47

actually shot anyone or forced any prisoner into a gas chamber, *no court has required such a showing* . . . . Hammer's interpretation of the Holtzman Amendment would read the words 'assisted, or otherwise participated' out of the statute. We conclude that *the requirements of the Holtzman Amendment may be satisfied even in the absence of eyewitness testimony that the alien personally engaged in acts of brutality.*

*Id.* at 843 (emphasis added). The Court explained:

We do not believe that *Petkiewytsch* compels the conclusion that 'assistance' to the Nazi regime can never be sufficient for deportation under the Holtzman Amendment, because such an interpretation would be squarely at odds with the text of the statute.

195 F.3d at 844. *Naujalis*, 240 F.3d at 646; *Kalejs*, 10 F.3d at 444; *Kairys*, 981 F.2d at 942; *Schellong*, 805 F.2d at 655.

Even if *Petkiewytsch* had not been repudiated by the Sixth and Seventh Circuits, and every other court which has considered it, its holding would not be available to Firishchak. Firishchak never has claimed that he involuntarily or reluctantly performed the duties of a Ukrainian Auxiliary policeman, or that conditions for Jews in the L'viv ghetto, and the city as a whole, were not punitive. *Petkiewytsch* is virtually inapplicable here.

c.    The relevance of *United States v. Sokolov*, 814 F.2d 864 (2d Cir. 1987),

*cert. denied*, 486 U.S. 1005 (1988), to the present case is illusive. Sokolov was a writer for a Russian-language newspaper published by the German miliary, and wrote virulently anti-Semitic articles urging the Soviet population to support anti-Jewish actions taken by the Nazis. 814 F.2d at 866. The Second Circuit found that Sokolov was ineligible for a visa under the DPA because he "advocated or assisted in the persecution of Jews." *Id.* at 874. The Court considered it irrelevant that "there was no showing of actual persecution . . . resulting from these articles." *Id.* The Court also found that Sokolov belonged to a hostile movement, and therefore independently was ineligible for a visa under DPA Section 13. *Id.* The Court declined to find that the Government had proven that Sokolov made material misrepresentations to obtain his visa, because while there was testimony from the officer-in-charge of the consulate where Sokolov obtained his visa that vice consuls "very often" asked an applicant about his or her wartime activities, there was no evidence that the vice consul who issued Sokolov's visa followed that practice. *Id.* at 872. Here, Everett Coe, the vice consul who processed Firishchak's visa application, testified credibly and unequivocally that in every case he always asked a visa applicant about his or her wartime activities and whereabouts -- particularly when the applicant was a man who during World War II lived in areas under Nazi occupation and was of age for Nazi service.

49

(*See* Finding of Fact # 54(e)). Firishchak admits that his membership in the Ukrainian Auxiliary Police, and his activities while serving in that unit, were material facts capable of affecting the decision of the vice consul as to whether he was eligible under the DPA for an immigrant visa. (*See* Agreed Legal Finding #13).

38. Because Firishchak was legally ineligible for a visa under DPA Section 2(b), and/or DPA Section 10, and/or DPA Section 13, and/or under State Department regulations, his admission into the United States was unlawful. (*See* Agreed Legal Finding #2-3, 17). A finding of visa ineligibility on any one of these four grounds (*i.e.*, Counts I through IV of the Complaint) is sufficient to establish that Firishchak was not lawfully admitted to the United States. *See Negele*, 222 F.3d at 448 (affirming denaturalization judgment on one of the district court's three bases for finding that Negele was ineligible for a visa); *Stelmokas*, 100 F.3d at 316 (denaturalization judgment must be upheld "even if we sustain only one of the [six] bases for [the district court's] conclusion that [Stelmokas] had been ineligible to enter the United States").

39. Since Firishchak was not lawfully admitted into the United States, his subsequent naturalization was unlawful under INA Section 316(a)(1), 8 U.S.C. § 1427(a). Pursuant to INA Section 340(a), 8 U.S.C. § 1451(a), his citizenship therefore was illegally procured. (*See* Agreed Legal Findings #1-

3, 17-18).

40. INA Section 340(a), 8 U.S.C. § 1451(a), requires that an individual's citizenship be revoked if it was illegally procured. Courts are without discretion to refrain from entering a judgment of denaturalization against a naturalized citizen whose citizenship was procured illegally. (Agreed Legal Findings #1-3, 17-19). *See Fedorenko*, 449 U.S. at 516.

41. Based upon the foregoing analysis, we find in favor of the government and find that because Firishchak's citizenship was illegally procured, Certificate of Naturalization No. 7365065, issued to him on November 11, 1954, by the United States District Court for the Northern District of Illinois, must be revoked. Further, a judgment must be entered forever restraining and enjoining Firishchak from claiming any rights, privileges, benefits, or advantages under any document evidencing United States citizenship. Firishchak also must be directed to surrender immediately and deliver to the Attorney General (or to his designee in the Office of Special Investigations) Certificate of Naturalization No. 7365065, his United States passport, should he have one, and any other indicia of United States citizenship.

## CONCLUSION

Based on the foregoing analysis, the court concludes that the government has

proved its case by clear, unequivocal, and convincing evidence with respect to all four counts. Therefore, we grant the relief requested by the government.

## ORDER

IT IS ORDERED that judgment is entered in favor of the government and against Defendant on Counts I through IV of the complaint.

IT IS FURTHER ORDERED that the Order of November 11, 1954, of the United States District Court, for the Northern District of Illinois granting the Defendant United States citizenship is REVOKED and SET ASIDE.

IT IS FURTHER ORDERED that Certificate of Naturalization No. 7365065 is CANCELLED and that Defendant shall immediately surrender Certificate of Naturalization No. 7365065 to the Attorney General of the United States (or to his designee in the Office of Special Investigations).

IT IS FURTHER ORDERED that Defendant shall immediately surrender his United States passport, if any, to the Attorney General of the United States (or to his designee in the Office of Special Investigations).

IT IS FURTHER ORDERED that Defendant is forever restrained and enjoined from claiming any rights, privileges, benefits, or advantages under any document evidencing United States citizenship.

IT IS FURTHER ORDERED that the Clerk of the Court shall transmit a copy of this Order and Judgment to the Attorney General of the United States (or to his designee in the Office of Special Investigations).

Samuel Der-Yeghiayan
United States District Court Judge

Dated: August 30, 2005